# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PRIDE MOBILITY PRODUCTS CORP.,

    Plaintiff,

    v.

MOBILITY PRODUCTS UNLIMITED, LLC, JOHN WARD, THERESA M. WARD, and BRYAN DYLEWSKI,

    Defendants.

CIVIL ACTION NO. 3:08-CV-231

(JUDGE CAPUTO)

## **MEMORANDUM**

Presently before the Court is the Motion for Partial Summary Judgment of Plaintiff Pride Mobility Products Corp. ("Pride") and the Motion for Summary Judgment of Defendant Bryan Dylewski. (Docs. 78, 81.) Because a genuine issue of material fact exists regarding breach of the oral contract forged between Pride and Defendant Mobility Products Unlimited, LLC ("MPU"), Pride's Motion for Partial Summary Judgment on this issue will be denied. However, no genuine issue of material fact exists regarding Defendant Bryan Dylewski and Defendants John and Theresa M. Ward's liability under the Guaranty and Suretyship Agreements signed by them, and Pride's Motion for Partial Summary Judgment on this issue will be granted. Also, genuine issue of material fact exists regarding the amount of damages for which Defendant Bryan Dylewski and Defendants John and Theresa M. Ward are liable and Pride's Motion for Partial Summary Judgment on this issue will be denied. Finally, there is no genuine issue of material fact regarding Defendant Bryan Dylewski's liability under the Guaranty and Suretyship Agreement and his Motion for Summary

Judgment will be denied.

The Court has jurisdiction over the claims arising under federal law pursuant to 28 U.S.C. §§ 1332.

# **BACKGROUND**

## **A.     FACTUAL BACKGROUND**

In 1996, Pride began providing MPU with mobility products such as scooters and power chairs. (Doc. 79, ¶ 14.) MPU was originally founded by Defendant Bryan Dylewski ("Dylewski") and his uncle, Richard Dylewski. (Dylewski Dep. 10:24-11:3, June 30, 2009). In 2002, Richard Dylewski sold his one-half share of MPU to Defendant John Ward, and Ward served as president of MPU from 2002 to 2005, and CEO from 2005 until 2008. (Ward Dep. 7:17-8:18, June 30, 2009.)

On May 18, 2005, John Ward entered into a Guaranty and Suretyship Agreement with Pride in order to continue the entities' business relationship and to secure future payments. (Ward Dep. 35:23-36:10.) In this agreement John Ward would "unconditionally guarantee to PRIDE the prompt and punctual payment of all sums dues from DEBTOR to PRIDE as well as any damages including collection fees and legal expenses that may arise in consequence of the failure of DEBTOR to make such payments when due." (Doc. 79, Ex. K.) The agreement applied to "any and all debts existing as of the date of this Agreement from DEBTOR to PRIDE, any and all debts about to be incurred by DEBTOR in favor of PRIDE reasonably contemporaneous with the execution of this Agreement, and any and all debts arising out of the sale of products from PRIDE to DEBTOR as aforereferenced." (*Id.*) On August 3, 2005, Teresa M. Ward, in order to continue the

2

business relationship between MPU and Pride, entered into a Guaranty and Suretyship Agreement containing this same language. (Doc. 81, Ex. J.)

On August 25, 2000, Dylewski also signed a Guaranty and Suretyship Agreement with Pride. (Doc. 81, Ex. G.) The only significant difference between the Dylewski Agreement and the ones signed by the Wards is that the Dylewski Agreement did not include collection costs and attorney's fees as recoverable damages. (*Id.*)

In 2004, MPU came under investigation by the Office of the Inspector General ("OIG") for potential violations of Medicare. (Dylewski Dep. 19:21-21:8.) As a result of this investigation, MPU signed a settlement agreement in 2005, wherein it agreed to pay two million, seven hundred seventy-five thousand dollars ($2,775,000.00) to the United States. (Doc. 81, Ex. L.) According to Dylewski, there was a verbal understanding between MPU's attorneys and Dylewski that part of the agreement included removing Dylewski from his management role at MPU, despite retaining his ownership interest. (Dylewski Dep. 24:21-25:8.) At that time, Thomas Donahue took over the role of president at MPU. (Doc. 79, ¶ 38.)

Between 1996 and 2005, MPU ordered its scooters from Pride on its credit account. (Doc. 79, ¶ 26.) In the fall of 2005, Pride scrutinized MPU's financial records and concluded that MPU had "serious problems" financially. (Meuser Dep. 20:24-21:12, July 1, 2009.) The President of Pride at the time estimated that the outstanding balance owed by MPU to Pride was approximately eight hundred thousand dollars ($800,000.00) in November 2005. (Meuser Dep. 27:17-27:23.) By January 2006, MPU's outstanding balance on its account with Pride was approximately 1.448 million dollars ($1,448,000.00). (Tavella Dep., 33:23-34:10, July 1, 2009.) To attempt to pay down the

debt on their account, MPU entered into a Note with Pride in January of 2006, calling for MPU to pay between forty and forty-five thousand dollars ($40,000.00-$45,000.00) per month for twelve months, to remove five hundred thousand dollars ($500,000.00) from the outstanding balance owed to Pride. (Tavella Dep. 24:19-24:24.) MPU successfully paid off the Note, but still owed Pride approximately nine hundred forty-eight thousand dollars ($948,000.00). (Tavella Dep., 34:11-34:15.)

In 2007, MPU's management decided that it would change its business model and prepay for scooters only when orders came in, rather than requesting products in anticipation of orders and charging them to a credit account. (Doc. 79, ¶ 43.) In April 2007, MPU and Pride entered into an oral payment agreement under which MPU would make payments of approximately ten thousand dollars ($10,000.00) per week or forty thousand dollars ($40,000.00) per month. (Doc. 79, ¶ 48.) It is Pride's position that this oral agreement did not encompass new product orders, which were to paid for up front, as per MPU's new plan to prepay for product. (Tavella Dep. 44:7-44:23.)

MPU continued to receive product until at least December 2007. (Doc. 79, Ex. S.) In May and June 2007, MPU was able to pay forty-two thousand, two hundred eighty dollars and eighty-two cents ($42,280.82) and thirty-four thousand, seventy-eight dollars and three cents ($34,078.03) toward the principal on their debt, respectively. (*Id.*) In July 2007, MPU paid over ten thousand dollars ($10,000.00) on two separate weeks, but only paid thirteen thousand, three hundred seven dollars and forty-one cents ($13,307.41) toward the debt principal for the month. Between August 2007 and December 2007, the amounts paid toward the principal of the debt are as follows: August: $55,502.48, September: $29,453.49, October: $27,271.97, November: $15,294.50, December:

4

$43,154.76.

On December 12, 2007, Pride sent a letter to John and Teresa M. Ward demanding payment in full on MPU's outstanding account balance, pursuant to the Guaranty and Suretyship Agreements of May 18, 2005 and August 3, 2005. (Doc. 79, Ex. A.) A similar letter was sent to Dylewski on December 14, 2007 and January 28, 2008. (Doc. 79, Exs. V, W.) Pride also sent a letter to Thomas Donahue at MPU on December 12, 2007, claiming that MPU had reduced its payments and giving MPU ten (10) days to work out a solution before the matter was turned over to the legal department. (Doc. 79, Ex. T.).

## B.   PROCEDURAL HISTORY

On January 22, 2008, Pride filed a complaint against MPU and John and Teresa M. Ward. In its January 22, 2008 Complaint, Pride presented four claims including (1) breach of contract by MPU (Count I), (2) unjust enrichment by MPU (Count II), (3) breach of Guaranty and Suretyship Agreement by John Ward (Count III), and (4) breach of Guaranty and Suretyship Agreement by Teresa M. Ward (Count IV). (Pride Mobility Complaint, Doc. 30, Ex. A.)

On February 5, 2008, Pride filed a Complaint in a second action naming Bryan Dylewski as Defendant. (Doc. 1.) The February 5, 2008 Complaint presents a single count against Bryan Dylewski for a breach of the Guaranty and Suretyship Agreement and seeks a judgment in the amount of one million thirty-two thousand, nine hundred seventeen dollars and ninety-one cents ($1,032,917.91). On May 6, 2008, Pride filed a Motion to Consolidate the cases involving MPU, John and Teresa M. Ward, and Bryan

5

Dylewski. (Doc. 9.) The Court granted this motion in an Order dated June 20, 2008. (Doc. 20.)

On April 30, 2008, Dylewski filed an Answer, Affirmative Defenses, and Third Party Claim. (Doc. 8.) On June 18, 2008, Third Party Defendant Invacare Corporation filed a Motion to Dismiss Dylewski's Third Party Complaint pursuant to Federal Rules of Civil Procedure 12(b)(5) & (6) and a Motion to Strike pursuant to Federal Rule of Civil Procedure 11(a). On July 28, 2008, Third Party Defendants Mobility Products Unlimited and John Ward filed a Motion to Dismiss Dylewski's Third Party Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) & (6). (Doc. 29.) Teresa M. Ward, a Defendant in Pride's original action, also joined in this Motion to Dismiss even though she was not named in Dylewski's Third Party Complaint. On July 31, 2008, Third Party Defendant Thomas Donahue joined in the Motion to Dismiss filed by MPU and John Ward on July 28. (Doc. 32.) On January 27, 2009, this Court dismissed all of Dylewski's Third Party Claims. (Doc. 55.)

On July 31, 2009, Pride filed a Motion for Partial Summary Judgment. (Doc. 78.) That same day, Dylewski also filed a Motion for Summary Judgment. (Doc. 81.) All current motions have been fully briefed and are now ripe for disposition.

## **LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if proof of its

6

existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

### A. PRIDE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pride moves for partial summary judgment, arguing that there is no genuine material issue of fact that MPU breached the 2007 oral agreement, that the individual defendants are bound by the terms of the suretyship agreements and are therefore liable to pay pride for the credit account balance that MPU owes Pride, and that there is no issue of fact regarding the amount owed to Pride on the principal.[1]

#### 1. Breach of Contract

In order to successfully litigate a breach of contract claim, the plaintiff must prove 1) the existence of a contract, 2) breach of the duty imposed by that contract, and 3) damages resulting from the breach. *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002).

It is undisputed in the instant case that there was a verbal agreement between Pride and MPU that MPU was to pay *approximately* ten thousand dollars ($10,000.00) per week or forty-thousand dollars ($40,000.00) per month to "pay down" the existing

---

[1] Pride argues that it is owed nine hundred fourteen thousand, eight hundred sixty-nine dollars and ninety-two cents ($914,869.92), plus interest, costs and attorney's fees to be determined.

8

credit account. Between May 2007 and December 2007, when Pride threatened legal action, MPU averaged payments of thirty-two thousand, two hundred fifty dollars and twenty-three cents ($32,250.23) per month. It is also unclear how long the oral agreement was supposed to last, or precisely how much of the debt Pride expected to have MPU "pay down." It is reasonable to suggest that the agreement did not anticipate having the entire debt paid down, as the parties had previous executed a note that only covered a portion of the outstanding balance on MPU's credit account. A reasonable jury could certainly find that an average payment exceeding thirty-two thousand dollars ($32,000.00) per month sufficiently satisfied an oral agreement requiring *approximately* forty-thousand dollars ($40,000.00) per month. Thus, there is a genuine issue of material fact regarding whether MPU actually breached the oral agreement with Pride and summary judgment will be denied on this count.

## 2. Defendants' Liability Under Guaranty and Suretyship Agreements

### a. Interpreting the Guaranty and Suretyship Agreements

A surety agreement is like any other contract and courts must turn to the language to determine the parties' rights and liabilities. *Citicorp North America, Inc. v. Thornton*, 707 A.2d 536, 539 (Pa. Super. 1998). Interpretation of a contract is a matter of law. *Maloney v. Valley Medical Facilities, Inc.*, 946 A.2d 702, 706 (Pa. Super. 2008). Where the meaning of a contract is clear, it is the duty of the court to interpret the contract. *Hewes v. McWilliams*, 194 A.2d 339, 342 (Pa. 1963). Summary judgment is appropriate in matters of contract interpretation only where the contractual language is subject to but

one reasonable interpretation. *Sanford Investment Co., Inc. V. Ahlstrom Machinery Holdings, Inc.*, 198 F.3d 415, 420-21 (3d Cir. 1999).

In the instant case, the Court finds that the language in the Guaranty and Suretyship Agreements signed by the individual defendants was clear. Under those agreements, the defendants were guaranteeing "all sums due" from MPU to Pride. This amount is later clarified in the agreement as all debts "existing as of the date of this Agreement," all debts "reasonably contemporaneous with the execution of this Agreement," and all debts "arising out of the sale of products . . . as aforereferenced." These aforementioned sales are clearly referring to the future sales intended to be induced by the suretyship agreements signed by defendants. Therefore, the Guaranty and Suretyship Agreements signed by the individual defendants clearly and unambiguously cover debts owed before the contract was signed, as the contract was signed, and debts occurred at some point after the contract was signed.

Defendants MPU and the Wards have spent much of their briefs arguing that the "reasonably contemporaneous" language suggests that the Agreements were signed in contemplation of the 2006 Note between Pride and MPU, thereby precluding Plaintiff from arguing that the Agreement applies to future debts. Defendants completely ignore the clause immediately following the "reasonably contemporaneous" language, which applies the Agreement to the future sales expected to be induced by the suretyship relationship. The Agreement is clearly not limited only to debts incurred concurrently with the signing of the contract.

Defendants' argument is also based on the premise that any debts arising from a breach of the 2007 oral contract between Pride and MPU are not covered by the

10

Guaranty and Suretyship Agreements, and therefore, defendants cannot be liable because 1) it is not clear that the oral agreement was, in fact, breached, and 2) the 2007 was not reasonably contemporaneous with the Agreement. This argument completely misconstrues Plaintiff's arguments. Plaintiff's claim for suretyship liability does not hinge on MPU's breach of the 2007 oral agreement, but instead hinges on MPU's failure to pay off the debts incurred on the entire credit account that it accrued with Pride over years and year of doing business with them. The 2007 oral agreement was simply an attempt to pay down the debt that was already owed to Pride. Regardless of whether MPU adhered to the 2007 oral agreement, MPU was still liable for any and all remaining debt that had already been incurred and not paid. As per the Guaranty and Suretyship Agreements, the individual defendants were also personally liable for these debts. Therefore, the Guaranty and Suretyship Agreements clearly and unambiguously apply to past, present and future debts incurred by MPU and owed to Pride.

### b. Suretyship Liability

However, the liability inquiry does not simply end with an interpretation of the suretyship contracts. Although there is only one clear and reasonable interpretation of the contracts at issue, it must be determined whether the sureties were discharged from their liabilities under the agreement. Even where a surety's liabilities are clear and unambiguous under the agreement, a material modification of the terms of the underlying creditor-debtor relationship will affect the surety's liability. *Reliance Insurance Co. v. Penn Paving, Inc.*, 734 A.2d 833, 838 (Pa. 1999). A gratuitous, or uncompensated surety, is completely discharged by a material modification in the creditor-debtor relationship,

11

whereas a compensated surety is only discharged if there has been a material modification in the creditor-debtor relationship without the surety's consent and that modification has substantially increased the surety's risk. *Id.* A material modification is one that so significantly changes the debtor-creditor relationship that it "in essence substitutes an agreement substantially different from the original agreement on which the surety accepted liability." *Id.* In determining whether a compensated surety has consented to a material modification, the contract must be given its expressed intention, gathered from the words and clauses taken as a whole, with due regard for the circumstances surrounding the contract. *Id.*

Pennsylvania courts have held that owners and officers of the debtor corporation and their spouses are compensated sureties when they act as sureties for the debts of the corporation. *McIntyre Square Assoc. v. Evans*, 827 A.2d 446, 452 n.8 (Pa. Super. 2003). The same is true for sole shareholders. *J.F. Walker*, 792 A.2d at 1274.

In *Continental Bank v. Axler*, 510 A.2d 726 (Pa. Super. 1986), the owners of a corporation executed signed surety agreements on two notes executed by the corporation with Continental Bank. The corporation was later sold to third parties, who then renegotiated a five-year note with the bank, representing an aggregate of the previous two notes, and then later defaulted on that note. *Continental Bank*, 510 A.2d at 728. The Pennsylvania Superior Court held that the previous owners were not discharged, because the change in the relationship between the corporation and the bank did not meet the "threshold showing of a material modification" and, in any event, the surety agreement had specifically waived notice of any fact that might materially

12

increase the risk, and had stated that they would be obligated for the liabilities of any entity that may have been a successor to the corporation. *Id.* at 729-30. Thus, there had not been a *material* modification, the surety agreement had consented to any modification that had occurred, and therefore the owners were not discharged from their liabilities under the agreement. *Id.* at 730.

In *Reliance*, the Pennsylvania Supreme Court applied *Continental Bank* to a situation where an indemnitee had signed an agreement that did not specifically consent to a material increase in the risk of liability. 734 A.2d at 839. In that case, the bonding line was increased from $200,000, when the indemnification agreement was signed, to $5,000,000. *Id.* at 836. The Pennsylvania Supreme Court reinstated the trial court's finding that the increase in the bonding line was a material modification of the indemnitee's risk. *Id.* at 836, 839. The court held the absence of "specific language relating to the increased risk of liability" and lack of language waiving the right to notice of material modifications distinguished the case from *Continental Bank* and discharged the indemnitee from liability under the agreement because she had no consented to the material modification. *Id.* at 839.

In *McIntyre Square*, a corporation entered into a five-year commercial lease with a shopping center and its property management company, with the co-owners and a co-owner's wife acting as sureties on the lease should the corporation default on the lease payments. 827 A.2d at 449. After the original five-year term, an Extension Agreement was signed, which extended the lease another five years. *Id.* During this second five-year term, the corporation defaulted on the lease and the property management company

13

sued the sureties, claiming that they were liable under the surety agreements. *Id.* The sureties argued that the lease extension was a material modification that substantially increased their risk under the surety agreements, and that they had not consented to such increase. *Id.* at 451.

The Pennsylvania Superior Court held that the lease extension was a material modification of the original lease that substantially increased the sureties' risk. *Id.* at 452. The court also held that the sureties had not consented to this increase in risk despite language in the suretyship agreement that said that the sureties would not be discharged by "any amendment or modification of the provisions of the Lease Agreement" or "any act, thing, omission or delay to do any act or thing that may, in any manner, or to any extent, vary the risk of Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law." *Id.* at 453. The court reasoned that the use of the word "otherwise" created ambiguity in the meaning of the contract, and therefore judgment as a matter of law on consent was inappropriate, and remanded the case for further proceedings. *Id.* at 454.

In the instant case, all the sureties are either co-owners of MPU or the spouse of a co-owner of MPU and are therefore compensated sureties, under *McIntyre*. As such, they must create a genuine issue of material fact to show that there was a material modification to the underlying creditor-debtor relationship that substantially increased their risk and that they did not consent to that modification.

Here, there is no proof of any material modification in the underlying creditor-debtor relationship between Pride and MPU. At the time both Dylewski and the Wards signed their surety agreements, the arrangement between MPU and Pride was that MPU

14

would order any scooters it received from Pride on its credit account. This was the exact same practice that continued until 2007 when MPU changed its business model and began to prepay for its scooters. The only change that occurred between the signing of the Guaranty and Suretyship Agreements and MPU's change in its business model was an increase in the underlying indebtedness. Although this certainly increased the risk incurred by Dylewski and the Wards, it did not constitute a material modification in the underlying *relationship* or substitute a new agreement between MPU and Pride, who continued to act as a manufacturer and a purchaser buying and selling product on credit. The only change that occurred at all was that MPU began prepaying for product, a modification that actually limited Defendants' risk. Therefore, Defendants cannot meet the threshold requirement of material modification for the discharge of a compensated surety.

This case is distinguishable from *Reliance*. In that case, the underlying creditor-debtor relationship was bound by the bond line that had been established when the indemnity agreement was signed. When this bond line was increased by nearly twenty-fold the underlying creditor-debtor relationship was materially modified, thereby discharging the indemnitee from liability. Unlike *Reliance*, there was no such cap on the credit line between Pride and MPU. Although the balance continued to increase on the credit account, it was consistently within the bounds of the original relationship between Pride and MPU and that relationship was never materially modified. Therefore, the situation here is distinguished from *Reliance*, and there was no material modification of the underlying debtor-creditor relationship.

This case can similarly be distinguished from *McIntyre*. The five-year lease in that

15

case set the parameters of the underlying relationship between the principal parties to which the sureties were bound. When this explicit lease term was extended with a significant increase in rent, the underlying relationship between the principals was materially altered. In the case at bar, the parameters of the relationship were not so explicit and simply consisted of Pride continuing to sell power scooters to MPU on credit. The relationship itself remained unaffected by the increase in debt, and therefore there was no material modification. Thus, Dylewski and the Wards were not discharged from the Guaranty and Suretyship Agreements and are liable for the debts guaranteed by those contracts because there was no material modification of the underlying creditor-debtor relationship. Summary judgment will be granted for Plaintiff.

### 3. Damages

Plaintiff also argues that there are no issues of material fact that Defendants owe Pride nine hundred fourteen thousand, eight hundred sixty-nine dollars and ninety-two cents ($914,869.92) in principal, plus interests, costs, and attorney's fees. However, there is genuine issue of fact on damages. In the deposition of Pride's 30(b)(6) witness, she testified that Pride had "expensed some of the balance to bad debt" and that the total balance on the MPU account stands at five hundred ninety-eight thousand, five hundred twenty-two dollars and thirty-seven cents ($598, 522.37). Furthermore, Dylewski's Guaranty and Suretyship Agreement does not contain the same provision as the Wards' regarding costs and fees. This is significant enough to create a genuine issue of fact regarding the debt remaining on the MPU for which Dylewski and the Wards are liable. As such, summary judgment will be denied on the question of damages.

## B. Defendant Dylewski's Motion For Summary Judgment

In his motion for summary judgment, Defendant Dylewski argues that 1) MPU changed the terms of the Guaranty and Suretyship Agreement without his consent, thereby discharging him, 2) Pride has failed to produce a signed Guaranty and Suretyship Agreement in unmodified form and 3) MPU did not breach the 2007 oral agreement and, therefore, the Guaranty and Suretyship Agreement signed by Dylewski should not be reached in this case.

As this Court has already explained the issue of material modification and surety liability above, it will not belabor the point here. As above, no genuine issues of fact exist regarding whether the underlying creditor-debtor relationship between MPU and Pride was materially modified.

The Court also answered Dylewski's third argument above when it noted that liability under the Guaranty and Suretyship Agreements is not premised on a breach of the 2007 oral agreement between MPU in Pride, but instead on the overdueness of MPU's general credit account. This account accrued an outstanding balance for years before suit was filed and before the 2006 note or the 2007 oral agreement were formed. Thus, whether or not MPU breached the 2007 oral agreement is not dispositive on the issue of Dylewski's liability under the Guaranty and Suretyship Agreement.

Dylewski's other argument is that the Guaranty and Suretyship Agreement produced by Pride has a handwritten address written on the top corner for a home that was not built until two year after Dylewski signed the contract. According to Pride, this address appeared in a post-it note that was added to the contract after the fact. Also, Pride has provided a Guaranty and Suretyship Agreement without this addressed listed.

(Doc. 79, Ex. H.) Finally, in his deposition Dylewski admits that he recalls signing a Guaranty around August 2000 and that it was his signature on the Guaranty and Suretyship Agreement produced by Pride with post-it note attached. (Dylewski Dep. 36:17-37:8.) These admissions are certainly enough to create an issue of fact suggesting that Dylewski signed a Guaranty and Suretyship Agreement with Pride. Furthemore, any issue fact in this case is not genuine. In light of the evidence produced by the Plaintiff including signed copies of the Guaranty and Suretyship Agreement and Dylewski's own testimony that he recalls signing such an agreement at the time in question, no reasonable jury could return a verdict for Dylewski based on this argument. Therefore, Dylewski's motion for summary judgment will be denied.

## **CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part Plaintiff's Partial Motion for Summary Judgment (Doc. 78) and deny Defendant Dylewski's Motion for Summary Judgment (Doc. 81). An appropriate Order follows.

| | |
|---|---|
| October 16, 2009 | /s/ A. Richard Caputo |
| Date | A. Richard Caputo |
| | United States District Judge |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PRIDE MOBILITY PRODUCTS CORP., | CIVIL ACTION NO. 3:08-CV-231 |
| | (JUDGE CAPUTO) |
| Plaintiff, | |
| v. | |
| MOBILITY PRODUCTS UNLIMITED, LLC, JOHN WARD, THERESA M. WARD, and BRYAN DYLEWSKI, | |
| Defendants. | |

## ORDER

**NOW**, this   16th   day of October, 2009, **IT IS HEREBY ORDERED** that:

(1)   Plaintiff's Motion for Partial Summary Judgment (Doc. 78) is **GRANTED in part and DENIED in part** as follows:

  (A)   Plaintiff's Motion is **GRANTED** as to Plaintiff's claim for breach of Guaranty and Suretyship Agreement against Defendant Bryan Dylewski, Defendant Theresa M. Ward, and Defendant John Ward.

  (B)    Plaintiff's Motion is **DENIED** as to Plaintiff's claim for breach of contract against Defendant Mobility Products Unlimited, LLC.

19

(C) Plaintiff's Motion is **DENIED** as to the amount of damages owed by Defendant Bryan Dylewski, Defendant Theresa M. Ward, and Defendant John Ward for breach of the Guaranty and Suretyship Agreement.

(2) Defendant Bryan Dylewski's Motion for Summary Judgment (Doc. 81) is **DENIED**.

.

                                          /s/ A. Richard Caputo
                                          A. Richard Caputo
                                          United States District Judge